UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE NTL, INC. SECURITIES LITIGATION

02 Civ. 3013 (LAK) (AJP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GORDON PARTNERS, et al.,                                   :

               Plaintiffs,                       :            02 Civ. 7377 (LAK) (AJP)

          -against-                              :

GEORGE S. BLUMENTHAL, et al.,                         :            **OPINION AND ORDER**

            Defendants.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

         Plaintiffs Gordon Partners, Frederick L. Gordon and Sam D. Gordon ("Gordon" or

the "Gordon plaintiffs") have moved for discovery sanctions against defendant NTL Europe, Inc. and

"nominal non-party NTL, Inc.," claiming that they hindered and delayed document discovery in this

case and allowed numerous documents and electronically stored information ("ESI"), including the

e-mails of approximately forty-four of NTL's "key players," to be destroyed. (02 Civ. 7377, Dkt. No.

30: Gordon Pls. Br.; 02 Civ. 7377, Dkt. No. 29: Notice of Motion & 4/11/06 Hermann Aff.)  The

Gordon plaintiffs request that the Court impose a range of sanctions, including an adverse inference

order for fact finding purposes during summary judgment or trial, and payment of attorneys' fees and

costs relating to this motion and the document discovery process.  (E.g., 4/11/06 Hermann Aff. ¶ 47.)

The Court heard oral argument on the motion on January 29, 2007.

        For the reasons set forth below, the Gordon plaintiffs' sanctions motion is GRANTED

in substantial part.  That is, the Court imposes an adverse inference instruction and awards the

Grodon plaintiffs attorneys' fees for the motion and the additional discovery costs caused by

defendant NTL Europe's conduct.

## FACTS

### The Securities Lawsuits and NTL's Bankruptcy

        The class-plaintiffs filed suit on April 18, 2002 against a company then known as

NTL, Inc. ("Old NTL"), alleging federal securities laws violations.  (See 02 Civ. 3013, Dkt. No. 1:

Class Compl.; see also 02 Civ. 3013, Dkt. Nos. 21, 25 & 28: Consolidated & Am. Compls.)  The

Gordon plaintiffs filed their complaint on September 13, 2002.  (02 Civ. 7377, Dkt. No. 1: Compl.)

        Old NTL and several of its subsidiaries entered into Chapter 11 bankruptcy, emerging

on September 5, 2002 with a "Second Amended Joint Reorganization Plan of NTL Incorporated and

Certain Subsidiaries" (the "Bankruptcy Plan").  (02 Civ. 7377, Dkt. No. 29: 4/11/06 Hermann Aff.

Ex. A: Bankruptcy Plan.)  Two main companies emerged out of the bankruptcy:  NTL Europe, Inc.

("NTL Europe"),[1] the successor company to Old NTL, and NTL, Inc. ("New NTL"), formerly known

as NTL Communications Corp.  (E.g., Bankruptcy Plan at 31-32.)  NTL Europe was primarily

---

[1]    NTL Europe is now known as PTV, Inc.  (See Dkt. No. 52: Def. NTL 8/21/06 Supp. Br. at 1.)  The Court will continue to refer to it as "NTL Europe."

responsible for selling off Old NTL's unprofitable assets, and New NTL became the surviving operational company with control of the company's European telecommunications assets.  (See 4/11/06 Hermann Aff. ¶ 3; see generally Schwartz Aff. Ex. 3: Bankruptcy Disclosure Statement.)[2] The Bankruptcy Plan specifically allowed the Gordon plaintiffs' and class plaintiffs' securities lawsuits to go forward after the bankruptcy, against the individual defendants and NTL Europe (as successor to Old NTL), but only to the extent of NTL Europe's insurance coverage.  (Bankruptcy Plan at 15-16, 50-52; 02 Civ. 7577, Dkt. No. 33: Schwartz Aff. Ex. 11: 6/13/03 Bankruptcy Order at 2; see 4/11/06 Hermann Aff. ¶ 2.)

**Document Sharing Clauses in The Demerger Agreement and Transitional Services Agreement**

Pursuant to the Bankruptcy Plan, defendant NTL Europe and non-party New NTL entered into a "Demerger Agreement" dated January 10, 2003, which specifies that:

4.     ACCESS TO INFORMATION

For a period of ten years from the date of this Agreement, each party shall . . . allow the other party and its personnel to have access to (during normal business hours and following not less than 48 hours' notice) and (at the expense of the party requesting the information) take copies of all documents, records or other materials containing any information which that party or any of its Group Companies or affiliated joint ventures might reasonably require to be able to comply with their respective legal, regulatory, accounting or filing obligations, or to resist, appeal, dispute, avoid or compromise any tax assessment, provided that nothing in this clause shall permit either party to copy any document, record or other material which is

---

[2]     Skadden Arps Slate Meagher & Flom LLP represents defendant NTL Europe in the Gordon and class actions and represented Old NTL in the bankruptcy proceedings.  (4/11/06 Hermann Aff. ¶ 3.)  Fried Frank Harris Shriver & Jacobson LLP represents nominal non-party New NTL in discovery in these proceedings, and represented the creditors committee during the bankruptcy proceedings.  (4/11/06 Hermann Aff. ¶ 3.)

subject to legal privilege.  Furthermore, each party shall . . . allow reasonable access to such of its duly authorised personnel, at all reasonable times during business hours upon prior written notice, as are required to permit the availability, access or, subject to the above restriction, copying of such information.

(02 Civ. 7377, Dkt. No. 33: Schwartz Aff. Ex. 12: Demerger Agmt. ¶ 4 at p. 5, emphasis added.)[3/]

       Also pursuant to the Bankruptcy Plan, defendant NTL Europe and non-party New NTL entered into a January 10, 2003 "Transitional Services Agreement," in which the parties stipulated that they would provide certain services to each other in order to smooth the transition after the companies emerged from bankruptcy.  The Transitional Services Agreement specifically provided that:

> The Services Provider [New NTL] shall provide the Services Recipient Group Companies [NTL Europe and its subsidiaries], or procure that the Services Recipient Group Companies are provided, <u>with such information and records</u> in relation to the Services as the Services Recipient [NTL Europe] may from time to time reasonably request and, without prejudice to the generality of the foregoing, the Services Provider shall use its reasonable commercial efforts to respond during Business Hours, orally or by telephone, facsimile transmission or in writing (as appropriate) to any request for further information made by the Services Recipient [NTL Europe].

(02 Civ. 7377, Dkt. No. 33: Schwartz Aff. Ex. 4: Transitional Services Agmt. ¶ 2.5 at p. 8.)

---

[3/]    The Demerger Agreement further provided that:

    6.     FURTHER ASSURANCE

       Each party shall . . . do, execute and perform all such further deeds, documents, assurances, acts and things as may reasonably be required to give effect to this Agreement.

(Demerger Agmt. ¶ 6 at p. 5.)

In a list of "Services" to be provided under the Transitional Services Agreement, under a heading for "Legal," the agreement states that "Euroco's [NTL Europe's] legal counsel shall have access to New NTL's legal department for the purpose of inquiring about historic transactions." (Transitional Services Agmt. at p. 33.)[4]

## Old NTL's 2002 Document Hold Memoranda

On March 13, 2002, a document "hold" memo was circulated to approximately seventeen employees of Old NTL:

> Although, under usual circumstances, destruction of documents/files, in the ordinary course is permitted, under certain circumstances, a company is under a duty to preserve documents that could be relevant to disputes with third parties. Basically, what this means is that you can have a policy that dictates which and when documents can be destroyed in the ordinary course, but once you are on notice that there may be litigation you are required to retain documents that would reasonably constitute evidence even if under your retention policy you would destroy such documents in the ordinary course.

> Accordingly, given the obvious possibility that we may encounter a heightened risk of litigious activity in the ongoing restructuring process, it is imperative that all documents that even possibly could be evidence in any such a matter be retained.

> Thank you.

---

[4] The Demerger Agreement and Transitional Services Agreement were publicly disclosed in 2003 when entered into. (02 Civ. 7377, Dkt. No. 35: Rodburg Aff. ¶ 5 & Ex. D; 1/30/07 Schwartz Ltr. to Court.) Plaintiffs' counsel, however, were not aware of the agreements until they received them after the Brodsky deposition. (See page 9 n.5 below.) In any event, as discussed below, the agreements' existence was not revealed to the Court until very late in the discovery process. (See pages 20-22 below.)

(02 Civ. 7377, Dkt. No. 29: 4/11/06 Hermann Aff. Ex. T.)   On March 14, 2002, the same memorandum was forwarded to approximately twenty-eight more employees at Old NTL with the following instruction:  "Please read and note carefully Lauren Blair's (Assistant General Counsel in New York) memorandum on the retention of documents.  Please forward to your reports as you consider appropriate.  Many thanks."  (4/11/06 Hermann Aff. Ex. T.)

On or about June 6, 2002, while Old NTL was in bankruptcy, another document hold memorandum about the <u>Gordon</u> and class action lawsuits was circulated to employees.  (<u>See</u> 02 Civ. 7377, Dkt. No. 33: Schwartz Aff. Ex. 5: 6/6/02 Document Hold Memo.)  The memo stated in part:

> NTL Incorporated and certain of its officers have been named as defendants in a number of purported securities class action lawsuits.  The complaints in those cases generally allege that NTL failed to accurately disclose its financial condition, finances and future prospects in press releases and other communications with investors prior to filing for reorganization in federal bankruptcy court.

> We presently do not know of any facts that would support these allegations, and we intend to defend the lawsuits vigorously.

> In connection with such lawsuits, NTL and its affiliates may be required to produce documents relevant to plaintiffs' claims.  Therefore, <u>as we have previously informed you, we are required to take reasonable steps to preserve all potentially relevant material that may exist (whether in paper or electronic format)</u>.  Relevant materials may include sales data, minutes or notes of meetings or conversations, financial statements, credit facilities and other loan documents, press releases, PowerPoint presentations and any other documents (including drafts) relating to the business, assets, properties, condition (financial or otherwise), and results of operations of NTL or its affiliates at any time after April 1, 1999.

> Please ensure that these types of documents are preserved until further notice.  When in doubt about possible relevance, you should err on the side of retaining the material.

(Schwartz Aff. Ex. 5: 6/6/02 Document Hold Memo, emphasis added.)

**A Brief History of Discovery in this Case Relevant to this Motion**

On May 2, 2005, the Gordon plaintiffs and class plaintiffs (collectively, "plaintiffs") served their initial document requests upon defendant NTL Europe and the individual defendants. (02 Civ. 7377, Dkt. No. 29: 4/11/06 Hermann Aff. ¶ 5 & Ex. B.)  On June 1, 2005, defendant NTL Europe and the individual defendants filed their objections and responses.  (4/11/06 Hermann Aff. ¶ 5 & Exs. C & D.)  Defendant NTL Europe's response to the document requests stated that  "NTL will produce documents, if any, responsive to [the] request."  (4/11/06 Hermann Aff. Ex. C.) Defendant NTL Europe, however, did not produce any responsive documents or e-mails.  (4/11/06 Hermann Aff. ¶ 7.)  Defendant NTL Europe's counsel informed plaintiffs' counsel that all corporate records relating to the 1999-2002 pre-bankruptcy period were in non-party New NTL's possession and that defendant NTL Europe did not possess any of these records.  (4/11/06 Hermann Aff. ¶ 7.)

George Blumenthal was the only individual defendant who produced any documents. (4/11/06 Hermann Aff. ¶ 6.)  Blumenthal had material because he had requested and obtained copies of his e-mails upon leaving his employment with Old NTL, some of which were probative of plaintiffs' allegations in this case.  (See 4/11/06 Hermann Aff. ¶ 6.)  Many of the probative e-mails are dated during 2001, the primary year involved in plaintiffs' allegations, and relate to NTL's accounting procedures.  (See 4/11/06 Hermann Aff. ¶ 6.)

On August 16, 2005, plaintiffs served a subpoena upon non-party New NTL requesting production of essentially the same documents as plaintiffs had requested from defendant NTL Europe. (4/11/06 Hermann Aff. ¶ 8 & Ex. F.)  Approximately two months later, non-party New

8

NTL made seventy boxes of documents available to plaintiffs' counsel for inspection and copying. (4/11/06 Hermann Aff. ¶ 8; see 02 Civ. 7377, Dkt. No. 35: Rodburg Aff. ¶ 12.)

On November 21, 2005, plaintiffs' counsel sent a letter to New NTL's counsel noting that New NTL had not produced several requested categories of documents, including financial analyses, subscriber integration and billing issues, and e-mail. (4/11/06 Hermann Aff. ¶ 9 & Ex. G.) On November 30, 2005, New NTL's counsel responded that New NTL does "not believe responsive documents that fall into the categories of documents which you reference in your letter as missing exist and/or can be produced," and concluded that in light of its "limited role" in the litigation, New NTL's production was "full and complete."  (4/11/06 Hermann Aff. ¶ 10 & Ex. H.)  New NTL's counsel also orally told plaintiffs' counsel that "responsive e-mails did not exist because the company's [computer] servers had been 'upgraded' after the reorganization." (4/11/06 Hermann Aff. ¶ 11.)

On December 6, 2005, plaintiffs' counsel served a subpoena upon non-party New NTL for a Rule 30(b)(6) deposition regarding New NTL's document production, and, after several scheduling difficulties, a deposition was scheduled for January 25, 2006.  (4/11/06 Hermann Aff. ¶ 13 & Ex. K.)

On December 20, 2005, plaintiffs' counsel took a Rule 30(b)(6) deposition of Jeffrey Brodsky, defendant NTL Europe's CEO.  (4/11/06 Hermann Aff. ¶ 12 & Ex. I: Brodsky Dep.) Brodsky testified that NTL Europe does not have physical possession of Old NTL's books and records. (4/11/06 Hermann Aff. ¶ 12 & Brodsky Dep. 46-50.)  Because non-party New NTL retained

the operating telecommunications assets after the bankruptcy, New NTL had physical possession of the books and records.  (4/11/06 Hermann Aff. ¶ 12 & Brodsky Dep. 52-53.)  This was the reason that defendant NTL Europe did not produce any documents in response to plaintiffs' May 2, 2005 subpoena.  (4/11/06 Hermann Aff.  ¶ 12 & Brodsky Dep. at 61.)  Brodsky testified that he did not know whether defendant NTL Europe ever requested responsive documents from non-party New NTL or its counsel despite the information sharing clauses in the Demerger Agreement and Transitional Services Agreement and despite Brodsky's statement that "[w]henever there was a document that we needed [from New NTL], we would call [New NTL] and ask if they had it, and if they had it, they'd send it."  (4/11/06 Hermann Aff. ¶ 12 & Ex. I: Brodsky Dep. 51-55, 60-62.)[5]

         In a letter dated January 24, 2006, New NTL's counsel disclosed to plaintiffs' counsel that New NTL had performed selected, targeted searches of 23,000 boxes of files in storage in four locations in the United Kingdom and had located no additional responsive documents, and further asserted that reviewing every box in storage to locate documents responsive to plaintiffs' document requests would be "overly burdensome, unreasonable, unrealistic and extraordinarily costly for [non-party] NTL."  (4/11/06 Hermann Aff. ¶ 15 & Ex. O at 2.)  New NTL offered to provide plaintiffs' counsel with an index of the 23,000 storage boxes and allow plaintiffs' counsel to perform an on-site review of any boxes on a per-box and per-day cost to plaintiffs.  (4/11/06 Hermann Aff. Ex. O at 3.)

---

[5]    According to the Gordon plaintiffs' counsel, all plaintiffs' attorneys were unaware of the Demerger Agreement and Transitional Services Agreement until vague mention of them during the Brodsky deposition, and the agreements themselves were not provided until even later.  (See 1/29/07 Oral Arg. Conf. Tr. at 24-27.)

New NTL also offered to perform targeted searches for the e-mail accounts of current and former NTL employees as requested by plaintiffs, at a specific cost to plaintiffs for each account downloaded.  (Id.)  New NTL also notified plaintiffs that electronic documents and e-mail of current and former NTL employees who worked in New York had been on a server in New York that was shut down in 2003 after the companies' emergence from bankruptcy, and the electronically stored information was transferred to a new server in the UK.  (Id. at 4.)  New NTL located the information on the new server in the UK and downloaded it onto three DVD's, which it sent to plaintiffs.  (Id.; see also Rodburg Aff. ¶ 18.)  Additionally, New NTL found a collection of computer back-up tapes for the New York server.  (4/11/06 Hermann Aff. Ex. O at 4.)  New NTL stated that its IT department was working with a vendor to determine the cost that plaintiffs would have to pay to access the information on the tapes to produce the information stored on them.  (Id. at 4-5.)  On January 25, 2006, New NTL's counsel sent a letter to plaintiffs' counsel with more information regarding the forty-six back-up tapes, and estimating how much plaintiffs would need to pay to restore the back-up tapes.  (4/11/06 Hermann Aff. ¶ 17 & Ex. R at 1-2.)

        At the January 25, 2006 New NTL Rule 30(b)(6) deposition, David Bond, a New NTL in-house lawyer testified that New NTL's IT system was outsourced to IBM in late 2002 or early 2003.  (4/11/06 Hermann Aff. ¶ 18 & Ex. S: Bond Dep. 66; see also Rodburg Aff. ¶ 8.)  Bond did not know what the e-mail retention policy was at the time of the outsourcing to IBM; IBM's current e-mail retention policy with respect to a former employee's e-mail account is that New NTL's IT department has access to the account for three months after an employee leaves the company, then

it goes to a back-up tape for nine months, after which it may be overwritten.  (Bond Dep. 67.)  Bond testified that the policy with regard to the e-mail accounts of current New NTL employees is that employees are free to retain e-mails or discard them "to suit their needs."  (Bond Dep. 68.)  In order to retain an e-mail, an employee must move the e-mail from their inbox to a separate folder, otherwise the e-mails in the inbox will start to be deleted after approximately three months.  (Bond Dep. 68-69.)  Bond stated that employees received new computers at the time of the outsourcing to IBM, and he did not know whether e-mails written on the old computers were placed on back-up tapes as part of the outsourcing.  (Bond Dep. 69-71.)  Bond was not aware of any communications within New NTL at the time of the outsourcing to IBM regarding retention of e-mail or documents pertinent to ongoing litigation.  (Bond Dep. 71-72.)

Bond testified that he first became involved with responding to plaintiffs' August 15, 2005 subpoena to New NTL in December 2005.  (Bond Dep. 77-79.)  Bond asked an assistant to work with New NTL's IT head to locate electronic files for the individual defendants, and also requested that she locate physical documents in the UK offices where the individual defendants may have worked.  (Bond Dep. 79-81.)  The assistant later notified Bond that the IT department was only able to find certain incoming e-mails for George Blumenthal, but that there were no other electronic files for Blumenthal or the other individual defendants because they were not on any NTL servers.  (Bond Dep. 82-83.)  Bond testified that the New York employees, with the exception of Stephen Carter, did not have outgoing e-mail accounts on the NTL servers because they had used outside service providers for their e-mail.  (Bond Dep. 84-85.)

Bond testified that at the request of New NTL's in-house legal director, the assistant and the IT department also searched for e-mails and electronic documents relating to other individuals that had been requested by plaintiffs' counsel. (Bond Dep. 98-101.) Those searches were completed the week before Bond's deposition.  (Bond Dep. 101.)  Bond did not know of any electronic searches that were performed at New NTL in relation to this litigation prior to the searches overseen by the assistant.  (Bond Dep. 103.)  Bond testified that back-up tapes for New NTL's UK servers are done annually, but they are overwritten the following year, so "there is only ever one backup tape in existence at one time."  (Bond Dep. 103.)  Bond stated that New NTL also creates daily back-up tapes, but that those back-up tapes usually are overwritten.  (Bond Dep. 104.)  Bond said that the first time he learned that some of the information from the New York servers had been moved to the UK server was in December 2005.  (Bond Dep. 104.)

On January 31, 2006, the Gordon plaintiffs' counsel requested an extension of the discovery deadline because of New NTL's failure to produce documents and e-mails, which this Court granted on February 2, 2006.  (4/11/06 Hermann Aff. ¶ 26 & Ex. W, Ex. X at 17.)

On February 3, 2006, plaintiffs' counsel sent New NTL a list of fifty-eight present and former NTL employees whose e-mails plaintiffs wished to have searched.  (4/11/06 Hermann Aff. ¶ 24 & Ex. V.)

On February 8, 2006, plaintiffs took the deposition of George Bernet, the information technology manager at Old NTL's executive offices in New York starting in 2001.  (4/11/06 Hermann Aff. ¶ 29 & Ex. CC: Bernet Dep.; see also Rodburg Aff. ¶ 8.)  Bernet testified that no one

ever asked him to save or preserve information because of threatened or pending litigation.  (Bernet Dep. 150.)  Bernet stated that NTL's New York server was decommissioned in 2004, with all electronic files transferred to the company's UK servers.  (Bernet Dep. 54-56.)[6/]  After that, the old computers from the New York office were donated to charity.  (Bernet Dep. 187.)  Bernet testified that full back-up tapes for the New York office were moved to the company's new Manhattan offices and also to a bank vault.  (Bernet Dep. 78, 88-89, 126-27, 136-37, 177, 180.)

On March 1, 2006, New NTL produced CD's containing the e-mail files of ten present or former NTL employees, three of which had already been provided to plaintiffs two weeks before. (4/11/06 Hermann Aff. ¶ 36.)  Therefore, as of March 1, 2006, plaintiffs had received e-mail files for only twelve of the fifty-eight employees requested.  (4/11/06 Hermann Aff. ¶ 36.)

On March 13, 2006, New NTL produced the New York office back-up tapes to plaintiffs' counsel.  (4/11/06 Hermann Aff. ¶ 32; see also Rodburg Aff. ¶¶ 14-16.)  At plaintiff's expense, the back-up tapes were restored and converted to readable, searchable files.  (4/11/06 Hermann Aff. ¶ 32.)  Plaintiffs' counsel's review of the back-up tapes revealed that they contained e-mails from senior executives who worked in NTL's executive offices in New York, but that the tapes did not contain any e-mail from 2001, the main year in which plaintiffs allege that defendant NTL Europe and its executives committed securities violations.  (4/11/06 Hermann Aff. ¶ 32; see

---

[6/]     On the other hand, another New NTL employee involved with the transfer of files from New York to the UK stated that only the e-mails of the employees who were continuing to work at New NTL after the move in 2003 were transferred to the UK server.  (4/11/06 Hermann Aff. ¶ 31 & Ex. DD.)

also 02 Civ. 7377, Dkt. No. 40: 5/2/06 Hermann Aff. ¶ 6: "The back-up tapes were made in 2000, 2002 and 2003 - but not 2001."; id. ¶ 9.)

On March 17, 2006, IBM's attorney advised plaintiffs' counsel that IBM completed the searches of the New NTL electronic files in its possession, and out of a list of fifty-seven current and former NTL employees, IBM found files for thirteen employees, most of whose files New NTL's counsel previously had produced to plaintiffs.  (4/11/06 Hermann Aff. ¶ 28 & Ex. BB.)  In e-mail correspondence between New NTL's counsel and plaintiffs' counsel, New NTL confirmed that it had searched several times for e-mails relating to the remaining current and former employees on the list and did not find anything at all, even though some produced documents indicate that at least three of those employees had e-mail accounts during the time period pertinent to the document request. (4/11/06 Hermann Aff. ¶¶ 37, 40 & Exs. HH, II, JJ & KK; see also Rodburg Aff. ¶¶ 19-21.)

During depositions of former NTL employees on March 24, 2006 and April 5, 2006, the employees had a very difficult time remembering events during 1999 - 2001 relating to plaintiffs' allegations without reviewing documents from that time period, but upon reviewing documents, their memories were substantially refreshed and they were able to discuss the events in detail.  (4/11/06 Hermann Aff. ¶¶ 42-43 & Exs. MM & NN.)  Plaintiffs' counsel notes that because "NTL's senior executives used e-mail extensively to communicate with each other and with other NTL executives and employees, about financial and operational issues," production of e-mails from those senior executives is crucial to the prosecution of plaintiffs' case. (4/11/06 Hermann Aff. ¶ 44.)  Indeed, the

e-mails that plaintiffs have obtained have provided them with important information relating to their claims.  (4/11/06 Hermann Aff. ¶¶ 6, 44.)

On June 27, 2006, plaintiffs' counsel updated the Court on the progress of discovery. (See 02 Civ. 7377, Dkt. No. 42: 6/27/06 Hermann Ltr. to Court.)  As of that date, the majority of the e-mails from the files of forty-four of the current and former employees on plaintiffs' list of "key players" were still missing from New NTL's document production, including those from individual defendants Barclay Knapp, John Gregg, and Steven Carter, as well as those of other top managers such as Leigh Wood, Scott Falconer and Dinesh Jain.  (6/27/06 Hermann Ltr. at 1.)  Additionally, very few pieces of external correspondence and personal meeting notes were provided, and no NTL communications with securities analysts or investment firms were produced.  (6/27/06 Hermann Ltr. at 1-2.)  On July 7, 2006, defendants' counsel wrote to the Court disputing plaintiffs' characterizations of New NTL's document production, and claiming that New NTL produced more relevant e-mails, written correspondence, and communications with securities analysts than plaintiffs indicated, listing examples of documents produced in each category.  (See 02 Civ. 7377, Dkt. No. 43: 7/7/06 Defs.' Ltr. to Court.)  Plaintiffs responded in a July 14, 2006 letter to the Court, explaining that the examples listed in defendants' letter did not come within plaintiffs' document request because most of them were not authored by anyone on plaintiffs' list of "key players" in this case, and suggesting that the few e-mails from non-"key players" that were produced further demonstrate how

extensively NTL personnel used e-mail to communicate with one another.  (See 02 Civ. 3013, Dkt. No. 114: 7/14/06 Hermann Ltr. to Court.)[7]

On August 14, 2006, the Gordon plaintiffs provided their final update to the Court regarding discovery.  (8/14/06 Supp. Hermann Aff.)  The Gordon plaintiffs confirmed that they had completed the depositions of the individual defendants, that they questioned the individual defendants about specific categories of missing documents and e-mails, and were told that many of the documents and e-mails from those categories previously existed but never were produced, presumably because they were discarded.  (Id. at ¶¶ 3-8, 15, 17 & Ex. A.)  On August 21, 2006, defendants responded to the Gordon plaintiffs' final update, essentially arguing that the Gordon plaintiffs did not provide evidence of the destruction of relevant documents in this case, and therefore that spoliation sanctions are not appropriate.  (See 02 Civ. 7377, Dkt. No 52: 8/21/06 Def. NTL Europe Supp. Br.; 02 Civ. 7377, Dkt. No. 51: 8/21/06 Individual Defs.' Br.)  Defendants specifically argued that while "the duty [to] preserve documents first arose in May 2002 upon commencement of the first shareholder litiation . . . , [t]he Gordon Supplement presents no evidence that Old NTL destroyed any relevant 'favorable' documents ["created between 2000 and the first quarter of 2002"] in or after May 2002, when a duty to preserve existed."  (Def. NTL Europe Supp. Br. at 3.)

---

[7]    On July 7, 2006, plaintiffs sent a letter to the Court containing an update on non-party McKinsey & Co.'s document production to date in this case.  (See 02 Civ. 7377, Dkt. No. 44: 7/7/06 Hermann Ltr. to Court.)  Plaintiffs claimed that they had found several highly relevant documents in McKinsey & Co.'s production that were never produced by defendant NTL Europe or non-party New NTL.  (Id.)

**Discovery Conferences With The Court**

The prior section discussed discovery from the parties' perspectives.  The Court had frequent conferences with counsel for the parties, and eventually also with counsel for non-party New NTL, but it was not until very late in the discovery process that the Court was informed of the Demerger Agreement.

At the November 21, 2005 conference, plaintiffs' counsel noted that it had just received seventy boxes containing a million pages of documents from non-party New NTL. (02 Civ. 3013, Dkt. No. 79: 11/21/05 Conf. Tr. at 2, 7.)  After clarification by defense counsel as to which "NTL" produced the documents, plaintiffs' counsel stated:

> Your Honor, if I could just direct some comment to that.  I think from a technical legal standpoint, they probably are separate entities, based upon how they emerged from bankruptcy.  And we tried multiple times to reach a resolution with [defendant NTL Europe's counsel] in particular about trying to get his cooperation and assistance in getting documents from [New] NTL.  Unfortunately, we couldn't resolve anything.
>
> We thought, rather than seek intervention from your Honor, we served a subpoena on [New] NTL.  We still believe that [defendant NTL Europe's counsel] has some persuasive say in assisting, but it's been difficult for us in that regard. We've had to go the subpoena route.

(11/21/05 Conf. Tr. at 3; see also id. at 6-7.) Plaintiffs' counsel said it already had found deficiencies in the non-party production, but since it had not yet had a meet and confer, the Court set a date for the next conference.  (Id. at 7-8.)

At the next conference, on December 1, 2005, plaintiffs' counsel again complained that neither of the two NTLs had produced e-mails, and that it would take 30(b)(6) depositions to learn more about both NTLs' electronic information systems:

> MR. SCOTTI:          Good afternoon, your Honor.  Dan Scotti for Milberg Weiss on behalf of the class plaintiffs.  The last time we were here, which was just a week or so ago, we had raised an issue of document production that we had reeived from nonparty [New] NTL Inc.  When this case was first started, there was one NTL entity, [Old] NTL Inc.  After the reorganization, there were two entities, [New] NTL Inc. and NTL Europe.  The NTL Inc. that exists today is a nonparty.  [Defendant] NTL Europe, which was formerly known as NTL Inc., is the entity which is represented by Skadden.
>
> We wrote a letter to Fried Frank, who represents the new NTL Inc., the nonparty, highlighting the production deficiencies.  Our main problem was that there were really very few, if any, emails or electronic documents produced whatsoever.  We were given access to several dozen boxes of paper, but there are zero electronic documents that were produced to us.
>
> All along we have been looking to [defendant] NTL Europe for documents.  Mr. Schwartz from Skadden has been telling us, we don't have anything, we are just a shell corporation, you are going to have to look at the new entity, NTL Inc.  That is what we have now done.
>
> Their response is, we have given you everything we have and there are absolutely no electronic documents whatsoever to produce.  That troubles us for a number of reasons.  First, Mr. Blumenthal, one of the named individual defendants, was able to produce thousands of pages of emails elecronically.  That was produced on CD with metadata which tells us that there were some electronic documents at some point that existed.
>
>            . . . .
>
> We think the next step here is to take a 30(b)(6) deposition of NTL Europe, the defendant, and perhaps a 30(b)(6) deposition of NTL Inc., to determine exactly what the relationship is between these two entities. . . .
>
>            . . . .

There might be a slightly bigger issue here, though.  I have been told by counsel for [New] NTL Inc., the nonparty, that the servers were upgraded in late 2003, after the reorganization, and documents were not preserved.  That troubles us, which is why we believe a 30(b)(6) might be appropriate.

THE COURT:          Make your record.  If it is a nonparty, I am not sure what good a spoliation instruction, if there was spoliation after a lawsuit began, what that gets you ultimately.  In any event, I am sure you have all read or you are about to be reading Judge Scheindlin's five or six relevant <u>Zubulake</u> opinions and the growing case law on electronic discovery and spoliation sanctions and all of that.

Make your record through depositions or other discovery so that we are not dealing with this in the abstract or based on bits and pieces of information, but that there is sufficient information for the Court to then act on, whenever that becomes appropriate.

MR. HERMANN:          Your Honor, Robert Hermann for Gordon Partners.  We have a nonparty here only in the most mythical sense.  We have a lawsuit that emerged out of the bankruptcy proceedings which explicitly recognized that we had a right to pursue this lawsuit at a time when the now two companies were only one company and the lawsuit was already pending.  Certainly everybody was on notice of this lawsuit.

THE COURT:          It sounds like you are starting to argue a motion which is not yet ripe.

(02 Civ. 3013, Dkt. No. 80: 12/1/05 Conf. Tr. at 3-7.)

At the next conference, on January 11, 2006, the Gordon plaintiffs' counsel began the conference by noting that defendant NTL Europe had "no e-mails from this [litigation] period" and that plaintiffs would be deposing a witness from non-party New NTL.  (1/11/06 Conf. Tr. at 2-3.) The Court noted that it did not know what legal authority it had over the non-party New NTL (the non-party subpoenas were not issued out of the Southern District).  (<u>Id</u>. at 5.)  Referring to <u>Zubulake</u> and possible spoliation inferences, the Court told plaintiffs to "make your record."  (<u>Id</u>. at 5-6.)  The

Court also suggested that "to the extent that the defendant NTL [Europe] has a business relationship or former business relationship with [non-party New NTL] that might be useful to say, you know, Get off the stick, guys. . . ." (Id. at 6.)  The Gordon plaintiffs' counsel again noted the problem, or as he called it, the "ruse," of the two NTLs:

> MR. HERMANN:      Your Honor, . . . I would just add that the distinction between party and nonparty here is, in our view, bogus.  Because this company was split in bankruptcy, and the party with the lawsuit ended up without the documents.  That was a decision they made.  They didn't tell that to the bankruptcy court.  And there may be an issue here with regard to going back to the bankruptcy court on some of this.
>
> But the ruse, as I see it, of leaving the documents with the company that didn't have the lawsuit was precisely the party/nonparty distinction.  So, we'll probably be back to you.

(Id. at 7.)  The Court ended the issue by saying it hoped non-party New NTL would be convinced to cooperate but that if not, the parties would have to brief the spoliation issue.  (Id. at 7-8.)

At the next conference, on February 2, 2006, counsel for non-party New NTL attended for the first time.  (02 Civ. 3013, Dkt. No. 85: 2/2/06 Conf. Tr. at 1-2.)  The Court welcomed New NTL's counsel (the Fried Frank law firm) by noting that "on the one hand, you're a non-party.  On the other, you're not quite a non-party . . . I'd like to know what we can do to speed up your client's review of electronic records and production thereof."  (Id. at 2.)[8/]

The Court learned about the Demerger Agreement from the Gordon plaintiffs' sanctions motion (02 Civ. 7377, Dkt. No. 30) immediately before the April 12, 2006 conference.

---

[8/]     Later in the conference, the Fried, Frank lawyer noted that "I am a non-party subject to a Delaware subpoena, but I knew if you'd asked me to speak, I would speak."  (Id. at 13.)

(See 02 Civ. 3013, Dkt. No. 92: 4/12/06 Conf. Tr. at 3-4.)  The Court was most "distressed" that defendant NTL Europe had never informed the Court of this agreement:

> THE COURT:        . . . . I skimmed the plaintiff's [sanctions] brief.  As I understand it from that, there is an access agreement that lets defendant NTL [Europe] have unfettered access to all the documents of the [New] NTL as represented by Fried, Frank.  That's news to me, and it is quite distressing to the Court since I have tiptoed delicately around Fried, Frank and their client, and thanked Fried, Frank for voluntarily appearing here and all of that, when, quite frankly, it should have been your client, Ms. Hardister [counsel for defendant NTL Europe], who was producing all these documents out of Europe pursuant to that access agreement.
>
> So that's not a definitive ruling by any means on this motion, but, I think you and Fried, Frank's client better seriously consider what, if anything, you can do to make plaintiffs happy, at least monetarily, with respect to all of the costs that went on treating the discovery as nonparty discovery of an entity sitting in Europe, when, in fact, it would appear – and I have not read the agreement; I've just read the brief that quotes or describes it – it would appear that NTL defendant had the obligation to produce all of this material in the United States as party discovery.
>
> If you want to address that at all now, you can, if you want to say anything.  Otherwise, I will be turning to Fried, Frank, but, frankly, the courtesy to a nonparty is about to disappear unless somebody tells me, since I haven't read the access agreement, that it was misdescribed in plaintiff's brief.
>
> MS. HARDISTER:    I understand.  Your Honor, we are prepared to respond to that [motion] at a later date.

(4/12/06 Conf. Tr. at 3-4, emphasis added.)  The Court sua sponte ruled that defendant NTL Europe now would be held responsible for reviewing the boxes that New NTL had in storage in Europe and producing responsive documents to plaintiffs' counsel in the United States:

> THE COURT:        The documents will be produced in the United States on a rolling basis starting Monday and ending no later than Friday of next week, all costs to be borne by defendant NTL.

Any applications, discussions, or any comments, Ms. Hardister, since your client just got hit with some costs that they perhaps were not expecting?

MS. HARDISTER [Counsel for Defendant NTL Europe]:   I understand, your Honor.  That's fine.

THE COURT:            That's fine, meaning you're consenting, or, that's fine, meaning you hear it?

MS. HARDISTER:      I'm consenting.

(Id. at 6; see also id. at 18-20.)  The Court also suggested that defendant NTL Europe at a minimum should work out an agreement with plaintiffs' counsel to reimburse plaintiffs' counsel for the additional expenses of the allegedly "non-party" discovery:

THE COURT:           . . . . Quite frankly, while the spoliation sanction of an inference is not one that I expect you'll be able to work out, if I have to rule on the additional request here, which is for attorney's fees for certain of the discovery disputes with respect to nonparty NTL and there are depositions of document custodians, etc., my guess is that you're going to lose.  So, depending on how you would like [the] written opinions to read, while I don't expect that the spoliation issue is something you all can work out . . . but I do strongly recommend that you work out whatever issues there are with respect to Mr. Hermann and the other plaintiffs' counsels the issues of legal fees as raised in the motion.

If you don't – obviously, I'm reacting based solely on a very fast reading of one side's papers and not the other, but if your client – I'll be very blunt.  If your client [defendant NTL Europe] has been silent throughout these proceedings about its access agreement implicitly, if not explicitly, misleading the Court as to the relationship between the defendant NTL that is in front of me and the "nonparty NTL" represented by Fried, Frank, [defendant] NTL is going to come out on the short end of this, as it should.

(Id. at 6-7, emphasis added.)

Defendant NTL Europe moved for reconsideration of my April 12, 2006 ruling requiring it to review and produce responsive boxes of documents from non-party New NTL's

warehouse.  (02 Civ. 7377, Dkt. No. 31.)  The Court denied reconsideration on the ground that

defendant NTL Europe's counsel consented at the conference.  (02 Civ. 3013, Dkt. No. 100: 5/2/06

Order.)  The Court rejected defendants' argument that the attorney at the conference was too junior

to knowingly consent, stating:  "Second-guessing a more junior attorney's representation to the Court

is not a basis for a firm to seek reconsideration.  It certainly is not a basis for the Court to grant it."

(5/2/06 Order at 2-3; see also 02 Civ. 3013, Dkt. No. 94: 4/25/06 Conf. Tr. at 11-14.)

    Defendant NTL Europe filed objections to my April 12 & 25, 2006 rulings and sought

a stay from Judge Kaplan.  (02 Civ. 7377, Dkt. Nos. 37-38.)  Judge Kaplan denied the stay.  (02 Civ.

3013, Dkt. No. 98: 5/3/06 Kaplan Order.)  Judge Kaplan quoted from the Demerger Agreement and

stated that "On the face of it, then, there is a compelling case that New NTL is obliged to furnish

[defendant NTL] Europe with whatever documents [NTL] Europe may request for purposes of this

litigation.  (5/3/06 Kaplan Order at 4.)  Judge Kaplan continued:

> To be sure, [defendant NTL] Europe makes a logic-chopping, circular
> argument:  (1) it can be compelled to produce only documents in its possession,
> custody or contol, (2) it therefore has no legal obligation to produce documents that
> are in the hands of New NTL, and (3) absent such a legal obligation, it has no power
> to require [New NTL] to give it the documents.  But the argument seems unlikely to
> prevail for a host of reasons.
>
> To begin with, it is quite doubtful that the parties to the [Demerger]
> agreement intended such a crabbed reading.  In view of the fact that New NTL has
> been producing documents in this action voluntarily, the practice of the parties
> clearly suggests a broader view.
>
> More basically, Ms. Hardister [defendant NTL Europe's counsel] consented
> to the order in question.  Thus, whatever might have been the case at the outset,
> [defendant NTL] Europe now is under a legal obligation to produce documents in the
> hands of New NTL.  It is an obligation that it voluntarily assumed.

In any case, the argument is especially unappealing in view of the facts that [defendant NTL] Europe appears to have adopted its present position at least in part out of pique and that it rather cavalierly allowed the deadline fixed by Judge Peck to slide by, uncomplied with, without making a serious effort to obtain a stay.

(5/3/06 Kaplan Order at 4-5.)   Judge Kaplan thus denied a stay but deferred a definitive ruling on defendant NTL Europe's objections to allow for further briefing by the parties.   (Id. at 5.)

Perhaps concerned about what that definitive ruling would be based on Judge Kaplan's preliminary views expressed in his May 3 Order, defendant NTL Europe withdrew its objections, reviewed the warehoused material and produced responsive documents.   (See 5/5/06 Schwartz Ltr. to Court & Att. "Withdrawal of Objections.")

## ANALYSIS

## I.    AUTHORITY FOR IMPOSING SANCTIONS FOR SPOLIATION

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).[9/]   "[T]he imposition of

---

[9/]    Accord, e.g. Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., No. 04-6282-CV, ---F.3d ---, 2007 WL 29977 at *6 (2d Cir. 2007); Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir. 2001); Ispat Inland, Inc. v. Kemper Envtl., Ltd., 05 Civ. 5401, 2006 WL 3478339 at *3 (S.D.N.Y. Nov. 30, 2006); Lumbermens Mut. Cas. Co. v. Banco Espanol de Credito, S.A., 03 Civ. 5819, 2006 WL 2987694 at *12 (S.D.N.Y. Oct. 13, 2006); Buskey v. Boston Mkt. Corp., No. 04 CV 2193, 2006 WL 2527826 at *7 (E.D.N.Y. Aug. 14, 2006); Donini Int'l, S.P.A. v. Satec (U.S.A.) LLC, 03 Civ. 9471, 2006 WL 695546 at *8 (S.D.N.Y. Mar. 16, 2006); Phoenix Four, Inc. v. Strategic Res. Corp., 05 Civ. 4837, 2006 WL 1409413 at *3 n.6 (S.D.N.Y. May 23, 2006); Chan v. Triple 8 Palace, Inc., 03 Civ. 6048, 2005 WL 1925579 at *4 (S.D.N.Y. Aug. 11, 2005); Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003); Pastorello v. City of New York, 95 Civ. 470, 2003 WL 1740606 at *7 (S.D.N.Y. Apr. 1, 2003), reconsideration denied, 2003 WL 22118972 (S.D.N.Y. Sept. 11, 2003).

sanctions for spoliation has deep historic roots." <u>Pastorello</u> v. <u>City of New York</u>, 2003 WL 1740606 at *7 (citing case from 1882).  "A court has the authority to impose sanctions on a party for spoliation and other discovery misconduct under its inherent power to manage its own affairs or under Rule 37 of the Federal Rules of Civil Procedure."  <u>Phoenix Four, Inc.</u> v. <u>Strategic Res. Corp.</u>, 2006 WL 1409413 at *3.[10/]  "Where a party violates a court order - either by destroying evidence when specifically directed to preserve it or by failing to produce information when directed to do so because the relevant data have been destroyed - Rule 37(b) of the Federal Rules of Civil Procedure provides that the court may impose a range of sanctions, including dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorneys' fees and costs." <u>Chan</u> v. <u>Triple 8 Palace, Inc.</u>, 2005 WL 1925579 at *4; Fed. R. Civ. P. 37(b).[11/]  "Indeed, '[e]ven though a party may have destroyed evidence prior to issuance of the discovery order and thus may be unable to obey, sanctions are still appropriate under Rule 37(b) because this inability was

---

[10/]    Accord, <u>e.g.</u>, <u>Residential Funding Corp.</u> v. <u>DeGeorge Fin. Corp.</u>, 306 F.3d 99, 106-07 (2d Cir. 2002); <u>Reilly</u> v. <u>Natwest Mkts. Group Inc.</u>, 181 F.3d 253, 267 (2d Cir. 1999), <u>cert. denied</u>, 528 U.S. 1119, 120 S. Ct. 940 (2000); <u>West</u> v. <u>Goodyear Tire & Rubber Co.</u>, 167 F.3d at 779; <u>L-3 Commc'ns Corp.</u> v. <u>OSI Sys., Inc.</u>, 02 Civ. 9144, 2006 WL 988143 at *13 (S.D.N.Y. Apr. 13, 2006); <u>Donini Int'l, S.P.A.</u> v. <u>Satec (U.S.A.) LLC</u>, 2006 WL 695546 at *8; <u>Chan</u> v. <u>Triple 8 Palace, Inc.</u>, 2005 WL 1925579 at *4; <u>Zubulake</u> v. <u>UBS Warburg LLC</u>, 229 F.R.D. at 430; <u>Zubulake</u> v. <u>UBS Warburg LLC</u>, 220 F.R.D. at 216; <u>Metro. Opera Ass'n, Inc.</u> v. <u>Local 100, Hotel Employees & Rest. Employees Int'l Union</u>, 212 F.R.D. 178, 219-20 (S.D.N.Y. 2003); <u>Barsoum</u> v. <u>NYC Hous. Auth.</u>, 202 F.R.D. 396, 399 (S.D.N.Y. 2001); <u>Turner</u> v. <u>Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68, 72 (S.D.N.Y. 1991).

[11/]    See also, <u>e.g.</u>, <u>Residential Funding Corp.</u> v. <u>DeGeorge Fin. Corp.</u>, 306 F.3d at 106-07; <u>Metro. Opera Ass'n, Inc.</u> v. <u>Local 100, Hotel Employees & Rest. Employees Int'l Union</u>, 212 F.R.D. at 219-20.

self-inflicted.'" Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *4 (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. at 72). "Where the alleged discovery misconduct consists of the non-production of evidence, a district court has broad discretion to fashion appropriate sanctions on a case-by-case basis." Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *3.[12]

"The sanctions imposed should serve the threefold purposes of deterring parties from engaging in spoliation, placing the risk of an erroneous judgment on the party who wrongfully created the risk, and restoring the prejudiced party to the position it would have been in had the misconduct not occurred." Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *3.[13]

---

[12]    See also, e.g., Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 107; Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir.), cert. denied, 534 U.S. 891, 122 S. Ct. 206 (2001); Experience Hendrix, LLC v. Chalpin, 06 Civ. 9926, --- F. Supp. 2d ---, 2006 WL 3230354 at *5 & n.33 (S.D.N.Y. Nov. 14, 2006) (Kaplan, D.J.); Zubulake v. UBS Warburg LLC, 220 F.R.D. at 216; Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union, 212 F.R.D. at 219.

[13]    Accord, e.g., Byrnie v. Town of Cromwell, 243 F.3d at 107; West v. Goodyear Tire & Rubber Co., 167 F.3d at 779; see also, e.g., Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998); Lumbermens Mut. Cas. Co. v. Banco Espanol de Credito, S.A., 2006 WL 2987694 at *12; Buskey v. Boston Mkt. Corp., 2006 WL 2527826 at *7; Pastorello v. City of New York, 2003 WL 1740606 at *8; Barsoum v. NYC Hous. Auth., 202 F.R.D. at 399; Turner v. Hudson Transit Lines, Inc., 142 F.R.D. at 74.

## II.   PLAINTIFF'S MOTION FOR AN ADVERSE INFERENCE IS GRANTED

### A.   Legal Standard Governing Adverse Inference Instructions

"The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)).

"An adverse inference instruction is a severe sanction that often has the effect of ending litigation because 'it is too difficult a hurdle for the spoliator to overcome' . . . Accordingly, this sanction 'should not be given lightly.'" Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *4 (citation omitted) (quoting Zubulake v. UBS Warburg LLC, 220 F.R.D. at 219-20); see also, e.g., West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

"A party that seeks an adverse inference instruction for destruction or late production of evidence must show that: (i) the party having control over the evidence had an obligation to preserve or timely produce it; (ii) the party that destroyed or failed to timely produce evidence had a 'culpable state of mind'; and (iii) the missing or tardily produced evidence is 'relevant' to the party's claim or defense 'such that a reasonable trier of fact could find that it would support that claim or defense.'" Phoenix Four, Inc. v. Strategic Res. Corp., 05 Civ. 4837, 2006 WL 1409413 at *4 (S.D.N.Y. May 23, 2006) (quoting Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)).[14/]

---

[14/]   Accord, e.g., Byrnie v. Town of Cromwell, 243 F.3d 93, 107-12 (2d Cir. 2001); Kronisch v. United States, 150 F.3d at 126-27; Experience Hendrix, LLC v. Chalpin, 06 Civ. 9926, ---
(continued...)

1.    **Duty to Preserve Evidence**

"In order for an adverse inference to arise from the destruction of evidence, the party

having control over the evidence must have had an obligation to preserve it at the time it was

destroyed.  This obligation to preserve evidence arises when the party has notice that the evidence

is relevant to litigation - most commonly when suit has already been filed, providing the party

responsible for the destruction with express notice, but also on occasion in other circumstances, as

for example when a party should have known that the evidence may be relevant to future litigation."

Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).[15/]  "Identifying the boundaries of the

---

14/      (...continued)
         F. Supp. 2d ---, 2006 WL 3230354 at *5 n.33 (S.D.N.Y. Nov. 14, 2006) (Kaplan, D.J.);
         Rivera v. Nat'l Passenger R.R. Serv., 442 F. Supp. 2d 164, 170 (S.D.N.Y. 2006); Buskey
         v. Boston Mkt. Corp., No. 04 CV 2193, 2006 WL 2527826 at *8 (E.D.N.Y. Aug. 14, 2006);
         L-3 Commc'ns Corp. v. OSI Sys., Inc., 02 Civ. 9144, 2006 WL 988143 at *13 (S.D.N.Y.
         Apr. 13, 2006); Anderson v. Sotheby's Inc. Severance Plan, 04 Civ. 8180, 2005 WL 2583715
         at *3 (S.D.N.Y. Oct. 11, 2005); Chan v. Triple 8 Palace, Inc., 03 Civ. 6048, 2005 WL
         1925579 at *4 (S.D.N.Y. Aug. 11, 2005); Zubulake v. UBS Warburg LLC, 229 F.R.D. 422,
         430 (S.D.N.Y. 2004); Zubulake v. UBS Warburg LLC, 220 F.R.D. at 220; Golia v. Leslie
         Fay Co., 01 Civ. 1111, 2003 WL 21878788 at *9 (S.D.N.Y. Aug. 7, 2003); Pastorello v. City
         of New York, 95 Civ. 470, 2003 WL 1740606 at *8-9 (S.D.N.Y. Apr. 1, 2003),
         reconsideration denied, 2003 WL 22118972 (S.D.N.Y. Sept. 11, 2003); Barsoum v. NYC
         Hous. Auth., 202 F.R.D. 396, 399 (S.D.N.Y. 2001).

15/      Accord, e.g., Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir.), cert. denied,
         534 U.S. 891, 122 S. Ct. 206 (2001); Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir.
         2001); Quinby v. WestLB AG, 04 Civ. 7406, 2006 WL 2597900 at *8 (S.D.N.Y. Sept. 5,
         2006), amended on other grounds, 2007 WL 38230 (S.D.N.Y. Jan. 4, 2007); Phoenix Four,
         Inc. v. Strategic Res. Corp., 05 Civ. 4837, 2006 WL 1409413 at *4 (S.D.N.Y. May 23,
         2006); Donini Int'l, S.P.A. v. Satec (U.S.A.) LLC, 03 Civ. 9471, 2006 WL 695546 at *8
         (S.D.N.Y. Mar. 16, 2006); Treppel v. Biovail Corp., 233 F.R.D. 363, 371 (S.D.N.Y. 2006);
         Anderson v. Sotheby's Inc. Severance Plan, 04 Civ. 8180, 2005 WL 2583715 at *3 (S.D.N.Y.
         Oct. 11, 2005); Chan v. Triple 8 Palace, Inc., 03 Civ. 6048, 2005 WL 1925579 at *4
                                                                                  (continued...)

duty to preserve involves two related inquiries:  *when* does the duty to preserve attach, and *what* evidence must be preserved?"  Zubulake v. UBS Warburg LLC, 220 F.R.D. at 216; accord, e.g., Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *4.  As Judge Scheindlin summarized in Zubulake:  "The scope of a party's preservation obligation can be described as follows:  Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  Zubulake v. UBS Warburg LLC, 220 F.R.D. at 218.

### a.    When The Duty To Preserve Attached

The original class action securities fraud complaint in this case was filed on April 18, 2002.  (See 02 Civ. 3013, Dkt. No. 1: Class Action Compl.)  Therefore at least by that date (if not before), defendants "reasonably anticipated litigation" and were on notice at least by that date that they had a duty to preserve evidence relevant to the litigation.  Indeed, defendants anticipated litigation even earlier than that, because Old NTL sent out document hold memoranda on March 13 and 14, 2002, alerting the employees who received it of "the obvious possibility that [NTL] may encounter a heightened risk of litigious activity in the ongoing restructuring process."  (02 Civ. 7377, Dkt. No. 29: 4/11/06 Hermann Aff. Ex. T, quoted on page 5 above.)  Both of these dates are well

---

[15/]     (...continued)
(S.D.N.Y. Aug. 11, 2005); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003); Pastorello v. City of New York, 95 Civ. 470, 2003 WL 1740606 at *9 (S.D.N.Y. Apr. 1, 2003), reconsideration denied, 2003 WL 22118972 (S.D.N.Y. Sept. 11, 2003); Barsoum v. NYC Hous. Auth., 202 F.R.D. 396, 400 (S.D.N.Y. 2001); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72-73 (S.D.N.Y. 1991).

before Old NTL and its subsidiaries entered bankruptcy on May 8, 2002.  (See 02 Civ. 7377, Dkt.

No. 32: Def. NTL Europe Opp. Br. at 4.)

Consequently, the duty to preserve attached in March 2002, or at the latest, on

April 18, 2002.  See, e.g., Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)

("[T]he relevant people at UBS anticipated litigation in April 2001.  The duty to preserve attached

at the time that litigation was reasonably anticipated.").[16]   Indeed, defendant NTL Europe has

conceded that the duty to preserve attached in March 2002.  (See 1/29/07 Oral Arg. Conf. Tr. at 3;

see also 02 Civ. 7377, Dkt. No. 52: 8/21/06 Def. NTL Europe Supp. Br. at 3.)

### b.   **What Documents Should Have Been Preserved**

"A party or anticipated party must retain all relevant documents (but not multiple

identical copies) in existence at the time the duty to preserve attaches, and any relevant documents

created thereafter."  Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); see also,

e.g., Quinby v. WestLB AG, 04 Civ. 7406, 2006 WL 2597900 at *9 (S.D.N.Y. Sept. 5, 2006),

amended on other grounds, 2007 WL 38230 (S.D.N.Y. Jan. 4, 2007).  The duty to preserve extends

"to any documents or tangible things (as defined by Rule 34(a) [including email]) made by

individuals 'likely to have discoverable information that the disclosing party may use to support its

---

[16]   See also, e.g., Henkel Corp. v. Polyglass USA, Inc., 194 F.R.D. 454, 456 (E.D.N.Y. 2000)
("At the latest, Henkel's duty to preserve the evidence attached on March 28, 1996, when
Nolan asked Henkel to provide him with the purchase invoice of the Polybond material to
help identify the manufacturer.  By that date, plaintiff had concluded that the Polybond
material was involved in causing the fire and clearly knew that it was likely to commence
litigation against Polybond's manufacturer.").

claims or defenses.'"  Zubulake v. UBS Warburg LLC, 220 F.R.D. at 217-18 (fn. omitted); see also,

e.g., Quinby v. WestLB AG, 2006 WL 2597900 at *9.  Additionally,

> The duty also includes documents prepared for those individuals, to the extent those
> documents can be readily identified (e.g., from the 'to' field in e-mails).  The duty
> also extends to information that is relevant to the claims or defenses of any party, or
> which is 'relevant to the subject matter involved in the action.'  Thus, the duty to
> preserve extends to those employees likely to have relevant information -- the 'key
> players' in the case.

Zubulake v. UBS Warburg LLC, 220 F.R.D. at 218 (fns. omitted).  As Judge Scheindlin summarzed

in Zubulake, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document

retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant

documents."  Zubulake v. UBS Warburg LLC, 220 F.R.D. at 218.[17]

Plaintiffs' complaints allege that Old NTL's directors, officers and managers

embarked on a series of poor management decisions that ultimately resulted in the company's

entering into bankruptcy, but falsely reported to the public throughout the period before the

bankruptcy that the company was in healthy financial condition.  (See 02 Civ. 3013, Dkt. Nos. 21,

25 & 28: Consolidated & Am. Compls.; 02 Civ. 7377, Dkt. No. 1: Compl.)  Therefore, the

employees of Old NTL that were most likely to have relevant information were the directors,

officers, managers and employees in charge of financial decision making within the company,

including subscriber integration and billing issues.  (See pages 14-15 above.)  Relevant documents

---

[17]    See also, e.g., Quinby v. WestLB AG, 2006 WL 2597900 at *8; Chan v. Triple 8 Palace, Inc.,
03 Civ. 6048, 2005 WL 1925579 at *6 (S.D.N.Y. Aug. 11, 2005); Convolve, Inc. v. Compaq
Computer Corp., 223 F.R.D. 162, 176 (S.D.N.Y. 2004), modified on other grounds, 2005
WL 1514284 (S.D.N.Y. June 24, 2005).

would include any e-mails between the directors, officers, managers and employees regarding the company's financial condition.  Indeed, NTL cannot argue that it did not know what documents and ESI to preserve, since its document hold memo instructed employees to "preserve all potentially relevant material that may exist (whether in paper or electronic format).  Relevant materials may include sales data, . . . financial statements . . . and any other documents (including drafts) relating to the business, assets, properties, condition (financial or otherwise), and results of operations of NTL or its affiliates at any time after April 1, 1999." (02 Civ. 7377, Dkt. No. 33: Schwarttz Aff. Ex. 5: 6/6/02 Document Hold Memo, quoted more fully on page 6 above.)  Therefore, NTL Europe had a duty to preserve all relevant documents including electronically stored information from its "key players" that existed as of March 2002.[18]  Although NTL sent out hold memos in March and June 2002 (see pages 5-6 above), those hold memos were not sufficient, since they subsequently were ignored by both NTLs.  See, e.g., Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("[I]t is not sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information.  Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched.").

---

[18]    The preservation requirement includes all relevant documents (including electronically stored information) that were "in existence" as of the time that the duty to preserve attached (here, March 2002).  Zubulake v. UBS Warburg LLC, 220 F.R.D. at 218.  As of March 2002, NTL had in its possession relevant documents and electronically stored information that dated at least back to 1999, because when individual defendant Blumenthal requested copies of his e-mails upon his departure in 2002, he received e-mails dated between March 16, 1999 and January 13, 2003, including the crucial year of 2001, which he later produced to plaintiffs in discovery.  (See 02 Civ. 7377, Dkt. No. 53: 8/23/06 Pls. Supp. Br. at 3; 02 Civ. 7377, Dkt. No. 29: 11/11/06 Hermann Aff. ¶ 6.)

        **c.**    **Defendant NTL Europe Had "Control" Over The Relevant Documents**

Defendant NTL Europe contends that, although it was the party designated after bankruptcy to continue as the defendant in this case, it nevertheless did not have "control" over any documents or ESI relevant to plaintiffs' document requests because they were in non-party New NTL's possession; therefore defendant NTL Europe contends that it was not responsible for any spoliation which may have happened since this case was filed.  (See 02 Civ. 7377, Dkt. No. 32: Def. NTL Europe Opp. Br. at 12-13.)

Under Rule 34(a), parties may request from their adversaries documents (including ESI) "which are in the possession, custody or control of the party upon whom the request is served." Fed. R. Civ. P. 34(a).  "The concept of 'control' has been construed broadly."  In re Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. 177, 180 (S.D.N.Y. 2006).[19]

"'The test for the production of documents is control, not location.'"  In re Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. at 180 (quoting Marc Rich & Co. v. United States, 707 F.2d 663, 667 (2d Cir.), cert denied, 463 U.S. 1215, 103 S. Ct. 3555 (1983)).  "Documents may be within the control of a party even if they are located abroad."  In re Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. at 180.[20]

---

[19]    Accord, e.g.,  Dietrich v. Bauer, 95 Civ. 7051, 2000 WL 1171132 at *3 (S.D.N.Y. Aug. 16, 2000), aff'd on reconsideration, 198 F.R.D. 397 (S.D.N.Y. 2001); M.L.C., Inc. v. N. Am. Philips Corp., 109 F.R.D. 134, 136 (S.D.N.Y. 1986).

[20]    Accord, e.g., Marc Rich & Co. v. United States, 707 F.2d at 667; Dietrich v. Bauer, 2000 WL 1171132 at *2; Cooper Indus., Inc. v. British Aerospace, Inc., 102 F.R.D. 918, 920 (S.D.N.Y. 1984).

Under Rule 34, "'control' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action."  Bank of New York v. Meridien Biao Bank Tanzania Ltd., 171 F.R.D. 135, 146-47 (S.D.N.Y. 1997); see also, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. at 180; Exp.-Imp. Bank of the United States v. Asia Pulp & Paper Co., 233 F.R.D. 338, 341 (S.D.N.Y. 2005); Dietrich v. Bauer, 2000 WL 1171132 at *3 ("'Control' has been construed broadly by the courts as the legal right, authority or practical ability to obtain the materials sought upon demand.") (emphasis added); In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 530 (S.D.N.Y. 1996); Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 (S.D.N.Y. 1992) (The courts have "interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement to the documents.") (emphasis added).

Here, defendant NTL Europe had both the legal "right" and certainly the "practical ability" to obtain the relevant documents from New NTL, and therefore had the necessary "control" of those documents to be able to preserve and produce them in this litigation, for three separate reasons:

First, the document sharing clause in the Demerger Agreement makes it clear that New NTL was to make available to defendant NTL Europe any documents that it needed to be able to comply with its legal obligations, such as this lawsuit.  (See 02 Civ. 7377, Dkt. No. 33: Schwartz

Aff. Ex. 12: Demerger Agmt. at 5, quoted at pages 3-4 above.)[21] Moreover, defendant NTL Europe's CEO demonstrated that NTL Europe had the simple "practical ability" to obtain the relevant documents from New NTL; he testified that "[w]henever there was a document that we needed [from New NTL] . . . , we would call [New NTL] and ask if they had it, and if they had it, they'd send it." (02 Civ. 7377, Dkt. No. 29: 4/11/06 Hermann Aff. ¶ 12 & Ex. I: Brodsky Dep. 51-53, 54-55, 61-62.) Based on these agreements and testimony, both this Court and Judge Kaplan ruled on a "preliminary" basis that defendant NTL Europe had the legal and/or practical ability to obtain documents (including e-mail) from New NTL.  (See pages 20-24 above.)  Nothing in the further briefing of the issue has changed the Court's view.  Accordingly, the Court holds that defendant NTL Europe had "control" over documents and ESI at New NTL for the purpose of this litigation.

Second, even if defendant NTL Europe and non-party New NTL had not been parties to the Demerger Agreement and Transitional Services Agreement, this Court finds that defendant NTL Europe still should be held to have "control" over the relevant documents and ESI possessed by New NTL for the purposes of document production in this case, under the reasoning of the decision in Bank of New York v. Meridien Biao Bank Tanzania Ltd., 171 F.R.D. at 146-49.  There, one of the original defendants went through a bankruptcy reorganization and assigned its interests to a new party.  When plaintiff requested documents from the defendant assignee, the assignee party

---

[21]    The Transitional Services Agreement also provided that New NTL was to give defendant NTL Europe any information and records that it needed for legal purposes regarding "historic transactions," which would also cover many, if not most, of the documents responsive to plaintiffs' document requests in this case. (Schwartz Aff. Ex. 4: Transitional Services Agmt. at 8, 33, quoted at pages 4-5 above.)

declined to produce those documents, stating that they were not in its possession, control or custody, and that plaintiff would have to get discovery from the now non-party assignor through the use of a third party subpoena.  Id.  The Court in Bank of New York found that although the assignee knew that the documents that it would need for the case were in the assignor's possession, but for some reason did not specifically obtain the explicit assurance that it could obtain the documents, this should not affect the plaintiff's right to discovery in the case.  Id. at 147-48.  The Court noted that the "[t]reatment of both assignor and assignee as parties for discovery . . . is proper when to do otherwise would frustrate discovery, regardless of whether this frustration is intentional or not . . . Otherwise a litigant by contracting with a third party could nullify and evade the rules of procedure." Id. at 148 (internal quotations & citations omitted).  The Court ultimately held that "[i]t would be patently unfair if [the assignee party] were able to continue to discover relevant information from [plaintiff] while relegating [plaintiff] to seek information from [the assignor] as a non-party," and thus the Court ordered the assignee party to "produce all documents relevant to the issues in this action" that were in the assignor's possession.  Id. at 149.  In so holding, the Court also noted that the assignee party had demonstrated an ability to retrieve critical documents from the assignor when needed, suggesting that the assignee party defendant had the requisite "practical ability" to obtain documents that satisfies the requirements of Rule 34.  Id. at 146-47.

This Court finds the situation in this case analogous to that in Bank of New York. Plaintiffs here filed their case against Old NTL prior to its entry into bankruptcy.  Upon emergence from bankruptcy, defendant NTL Europe was assigned to be the entity to replace Old NTL in the

lawsuit.  Defendant NTL Europe's CEO testified that NTL Europe had the practical ability to obtain any documents it needed from New NTL.  Therefore, under <u>Bank of New York</u>, even without the clear document sharing provisions of the Demerger Agreement and Transitional Services Agreement, defendant NTL Europe had "control" over "Old NTL's" documents possessed by New NTL that were relevant to this lawsuit, and in any case, it would be patently unfair for defendant NTL Europe to benefit from the artificial separation of entities that was created after the bankruptcy.  <u>See also</u> <u>In re Flag Telecom Holdings, Ltd. Sec. Litig.</u>, 236 F.R.D. at 181-82 (holding that former executive of non-party corporation had the requisite "control" over relevant documents possessed by the corporation because he had the "practical ability" to obtain the documents); <u>Exp.-Imp. Bank of the United States</u> v. <u>Asia Pulp & Paper Co.</u>, 233 F.R.D. at 341-42 (holding that plaintiff bank had the apparent practical ability to obtain relevant documents from its non-party former employee, or at the very least, had to ask its former employee for the documents "before asserting that they have no control over documents in the former employees' possession."); <u>Dietrich</u> v. <u>Bauer</u>, 2000 WL 1171132 at *3-4 (holding that defendant parent company had sufficient "control" over documents at non-party subsidiary company and ordering that parent company was responsible for producing subsidiary company's documents within ten days).

There is, however, a third reason why NTL Europe can be sanctioned for failing to produce relevant documents and electronically stored information, even if (as it claims), it had no legal or practical ability to obtain the documents and ESI from New NTL.  Once the duty to preserve material for litigation arises – as it did here in March 2002, before NTL emerged from bankruptcy

– the party has a duty to initiate a "litigation hold" and preserve potentially responsive documents and ESI.  See, e.g., Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 433-34 (S.D.N.Y. 2004).  NTL initiated such a hold (or at least sent some hold memos to that effect).  (See pages 5-6 above).  If defendant NTL Europe thereafter turned relevant "held" documents and ESI over to New NTL without itself preserving (or insuring that New NTL would preserve) such information for possible production in this litigation, it failed in its obligation to preserve relevant material, and thus spoliated evidence (assuming the other requirements for spoliation are met).[22]  Thus, either the Demerger Agreement gave defendant NTL Europe the ability to obtain relevant documents and ESI from New NTL, in which case it had sufficient "control" to be responsible to produce the material in discovery, or if the Demerger Agreement did not give defendant NTL Europe that right, then defendant NTL Europe failed to have a sufficient litigation hold in place and therefore engaged in spoliation when it transferred documents to New NTL.  See, e.g., Zubulake v. UBS Warburg LLC, 229 F.R.D. at 433-34 ("First, counsel must issue a 'litigation hold' at the outset of litigation or whenever litigation is reasonably anticipated.  The litigation hold should be periodically re-issued . . . Second, counsel should communicate directly with the 'key players' in the litigation . . . [T]he key players should be periodically reminded that the preservation duty is still in place.").  Counsel for defendant NTL Europe conceded that NTL Europe did not take any action to ensure that New NTL would preserve

---

[22]   The Court believes this further supports its, and Judge Kaplan's, interpretation of the Demerger Agreement as providing defendant NTL Europe with the ability to obtain documents and ESI from New NTL.

the documents and ESI that it received from NTL Europe after the bankruptcy.  (1/29/07 Oral Arg.

Conf. Tr. at 13-14.)[23/]

For the reasons set forth above, defendant NTL Europe had "control" and thus a duty

beginning in March 2002 to preserve documents and ESI relevant to this litigation, even though most

of those documents and ESI ended up in the physical possession of non-party New NTL.

### 2.    Culpable State of Mind

"The preservation obligation runs first to counsel, who has 'a duty to advise his client

of the type of information potentially relevant to the lawsuit and of the necessity of preventing its

destruction.'"  Chan v. Triple 8 Palace, Inc., 03 Civ. 6048, 2005 WL 1925579 at *6 (S.D.N.Y.

---

[23/]    At oral argument, counsel for defendant NTL Europe suggested that plaintiffs' counsel should have sought a preservation order at the very start of the litigation to ensure that neither of the two NTLs that emerged from bankruptcy spoliated evidence.  (See 1/29/07 Oral Arg. Conf. Tr. at 9-12, citing In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig., 347 F. Supp. 2d 538, 540-42 (S.D. Ohio 2004), & In re Royal Ahold N.V. Sec. & Erisa Litig., 220 F.R.D. 246, 249-52 (D. Md. 2004).)  The Court need not decide whether, had plaintiffs (or defendant NTL Europe, for that matter) requested a preservation order aimed at New NTL (or NTL Europe), such a preservation order would have been granted.  See, e.g., Treppel v. Biovail Corp., 233 F.R.D. 363, 370-73 (S.D.N.Y. 2006) (discussing appropriate standard to determine whether to issue preservation order); Asset Value Fund Ltd. P'ship v. Fund/SVP, Inc., 97 Civ. 3977, 1997 WL 588885 at *1 (S.D.N.Y. Sept. 19, 1977) (Kaplan, D.J.). Defendant NTL Europe does not seriously contend that plaintiffs' failure to seek a preservation order should let defendant NTL Europe off the hook of its preservation obligations.  Cf. Asset Value Fund Ltd. P'ship v. Fund/SVP, Inc., 1997 WL 588885 at *1 (While declining to issue preservation order to defendant's non-party affiliate that had not been served with even a subpoena, Judge Kaplan noted that "knowing destruction or disposal of evidence in the face [of] prospective litigation" carries serious consequences including criminal prosecution.).

Aug. 11, 2005).[24]    "Where the client is a business, its managers, in turn, are responsible for conveying to the employees the requirements for preserving evidence." Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *6; Turner v. Hudson Transit Lines, Inc., 142 F.R.D. at 73.

"The 'culpable state of mind' requirement is satisfied in this circuit by a showing of ordinary negligence." Phoenix Four, Inc. v. Strategic Res. Corp., 05 Civ. 4837, 2006 WL 1409413 at *4 (S.D.N.Y. May 23, 2006).[25]

Defendant NTL Europe's conduct demonstrates a sufficiently culpable state of mind to warrant spoliation sanctions. While Old NTL circulated two document hold memoranda to certain employees (see pages 5-6 above), many NTL employees never received the memoranda. Moreover, there is no evidence that either of the two NTLs ever reminded employees (especially at New NTL) of the need to continue to preserve relevant documents and ESI. The evidence, in fact, is that no adequate litigation hold existed at the NTLs. In late 2002 or early 2003, NTL's IT system was outsourced to IBM, which apparently did not have any document hold in place at all. (See pages 10-11 above.) New NTL employees also received new computers at the time of the outsourcing to IBM,

---

[24]    See also, e.g., Fayemi v. Hambrecht & Quist, Inc., 174 F.R.D. 319, 326 (S.D.N.Y. 1997); Pastorello v. City of New York, 95 Civ. 470, 2003 WL 1740606 at *9 (S.D.N.Y. Apr. 1, 2003), reconsideration denied, 2003 WL 22118972 (S.D.N.Y. Sept. 11, 2003); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 73 (S.D.N.Y. 1991).

[25]    See also, e.g., Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 101, 108-09 (2d Cir. 2002); L-3 Commc'ns Corp. v. OSI Sys., Inc., 02 Civ. 9144, 2006 WL 988143 at *14 (S.D.N.Y. Apr. 13, 2006); Anderson v. Sotheby's Inc. Severance Plan, 04 Civ. 5180, 2005 WL 2583715 at *3 (S.D.N.Y. Oct. 11, 2005); Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *6; Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 431 (S.D.N.Y. 2004); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

and New NTL does not know whether any e-mails written on the old computers were saved or not. (See page 11 above.)  Additionally, New NTL did not convey any litigation hold instructions to IBM at the time of the outsourcing.  (See page 11 above.)  More generally, defendant NTL Europe's counsel conceded that NTL Europe took no steps after bankruptcy to ensure that New NTL personnel continued the litigation hold.  (See 1/29/07 Oral Arg. Conf. Tr. at 13-14.)

　　　　As a result, NTL Europe (through New NTL) was only able to produce e-mail files for thirteen out of fifty-seven requested current and former NTL employees who are the "key players" involved in plaintiffs' allegations.  Counsel for non-party New NTL points out that "New NTL has made significant and meaningful efforts to cooperate with the Plaintiffs' discovery requests in a timely manner consistent with this Court's discovery deadlines."  (See 02 Civ. 7377, Dkt. No. 34: New NTL Opp. Br. at 1, fn. omitted.)[26]  This suggests that if defendant NTL Europe had requested the relevant documents from New NTL in the beginning of the discovery process, New NTL would have responded, as it was their duty to do, in a "timely manner" so as to help NTL Europe produce the documents and ESI to meet the discovery deadlines and obligations in this case.  However, NTL Europe never asked New NTL for documents and ESI responsive to plaintiffs' document requests.  Instead, NTL Europe's counsel merely stated that it did not have any documents or ESI to produce,

---

[26]    While the Gordon plaintiffs seek spoliation and other sanctions against non-party New NTL, they have cited no authority for a spoliation instruction as to a non-party.  In any event, the Court finds that imposing a spoliation inference sanction and costs against defendant NTL Europe to be the appropriate sanction in this case; no separate sanction is or need be imposed on non-party New NTL.

insisted that plaintiffs subpoena non-party New NTL, and failed to advise the Court of the Demerger Agreement.  (See pages 17, 20-21 above.)

Consequently, the Court finds that NTL Europe's utter failure to preserve documents and ESI relevant to plaintiffs' allegations in this case (and its failure to advise the Court about the Demerger Agreement) to be at least grossly negligent.  See, e.g., Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *5-6 (defense counsel's failure to conduct a reasonable and timely inspection of defendant's computers and servers, which resulted in late discovery and production of 200-300 boxes of documents, constituted gross negligence); Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *7 ("[T]he utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent.  That is what occurred here: the defendants systematically destroyed evidence because they had never been informed of their obligation to suspend normal document destruction policies."); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) (failure to preserve specific key employee's backup tapes that were particularly relevant to plaintiff's allegation was gross negligent if not reckless); Golia v. Leslie Fay Co., 01 Civ. 1111, 2003 WL 21878788 at *8-9 (S.D.N.Y. Aug. 7, 2003) (defendant's failure to prevent key employee from destroying documents at time she was terminated was "grossly negligent"); Pastorello v. City of New York, 2003 WL 1740606 at *11 (loss of data resulting from unfamiliarity with record-keeping policy by the defendant employee responsible for preserving and producing document was grossly negligent). The second requirement for imposition of an adverse inference instruction therefore is met.

### 3.    **Relevance**

"Finally, a party seeking sanctions for spoliation must demonstrate that the evidence destroyed was 'relevant' to its claims or defenses.  At least where more severe sanctions are at issue, this means that the moving party must show that the lost information would have been favorable to it." <u>Chan</u> v. <u>Triple 8 Palace, Inc.</u>, 03 Civ. 6048, 2005 WL 1925579 at *7 (S.D.N.Y. Aug. 11, 2005).  "'[R]elevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.  Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" <u>Residential Funding Corp.</u> v. <u>DeGeorge Fin. Corp.</u>, 306 F.3d 99, 108-09 (2d Cir. 2002) (fn. omitted, brackets in original).[27]

"Courts must take care not to 'hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence,' because doing so 'would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction.'"  <u>Residential Funding Corp.</u> v. <u>DeGeorge Fin. Corp.</u>, 306 F.3d at 109 (brackets in original).[28]

---

[27]    <u>See also</u>, <u>e.g.</u>, <u>Byrnie</u> v. <u>Town of Cromwell</u>, 243 F.3d 93, 110 (2d Cir. 2001); <u>Kronisch</u> v. <u>United States</u>, 150 F.3d 112, 127 (2d Cir. 1998); <u>Rivera</u> v. <u>Nat'l Passenger R.R. Serv.</u>, 442 F. Supp. 2d 164, 170 (S.D.N.Y. 2006); <u>L-3 Commc'ns Corp.</u> v. <u>OSI Sys., Inc.</u>, 02 Civ. 9144, 2006 WL 988143 at *14 (S.D.N.Y. Apr. 13, 2006); <u>Chan</u> v. <u>Triple 8 Palace, Inc.</u>, 2005 WL 1925579 at *6.

[28]    <u>Accord</u>, <u>e.g.</u>, <u>Kronisch</u> v. <u>United States</u>, 150 F.3d at 128; <u>Phoenix Four, Inc.</u> v. <u>Strategic Res. Corp.</u>, 05 Civ. 4837, 2006 WL 1409413 at *4 (S.D.N.Y. May 23, 2006); <u>Golia</u> v. <u>Leslie Fay</u>
(continued...)

"Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 109.[29/] "Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 109.[30/] "Accordingly, where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the 'culpable state of mind' factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the 'relevance' factor)." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 109.

---

[28/]   (...continued)
Co., 01 Civ. 1111, 2003 WL 21878788 at *11 (S.D.N.Y. Aug. 7, 2003).

[29/]   Accord, e.g., L-3 Commc'ns Corp. v. OSI Sys., Inc., 2006 WL 988143 at *14; Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *4; Anderson v. Sotheby's Inc. Severance Plan, 04 Civ. 5180, 2005 WL 2583715 at *3 (S.D.N.Y. Oct. 11, 2005); Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *8; Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 431 (S.D.N.Y. 2004).

[30/]   Accord, e.g., Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 267-68 (2d Cir. 1999), cert. denied, 528 U.S. 1119, 120 S. Ct. 940 (2000); L-3 Commc'ns Corp. v. OSI Sys., Inc., 2006 WL 988143 at *14; Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *4; Anderson v. Sotheby's Inc. Severance Plan, 2005 WL 2583715 at *3.

In the absence of bad faith or gross negligence by the alleged spoliator, the relevance element can be established if the moving party "submit[s] extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to it." <u>Chan</u> v. <u>Triple 8 Palace, Inc.</u>, 2005 WL 1925579 at *8.[31/]  "For example, in <u>Byrnie</u>, the party seeking the adverse inference established relevance through deposition testimony regarding the nature of the missing documents, which [the Second Circuit] held were likely 'relevant' for purposes of an adverse inference in light of the opponent's shifting theory of the case." <u>Residential Funding Corp.</u> v. <u>DeGeorge Fin. Corp.</u>, 306 F.3d at 109 (citing <u>Byrnie</u> v. <u>Town of Cromwell</u>, 243 F.3d at 109-10); <u>accord</u>, <u>e.g.</u>, <u>Chan</u> v. <u>Triple 8 Palace, Inc.</u>, 2005 WL 1925579 at *8.

As discussed above, the Gordon plaintiffs have demonstrated that defendant NTL Europe's failure to preserve documents and ESI relevant to plaintiffs' allegations was at a minimum grossly negligent.  In light of NTL Europe's failure to call the Demerger Agreement to the Court's attention, the Court could find bad faith, but it need not reach that issue.  Thus, no extrinsic proof of relevance is necessary, and the Gordon plaintiffs are entitled to an adverse inference spoliation instruction.

Even if extrinsic proof of relevance were necessary, the Gordon plaintiffs have supplied proof that the missing evidence was likely to have been favorable to them:  The Gordon

---

[31/]   See also, e.g., <u>Residential Funding Corp.</u> v. <u>DeGeorge Fin. Corp.</u>, 306 F.3d at 109; <u>Byrnie</u> v. <u>Town of Cromwell</u>, 243 F.3d at 110-11; <u>Phoenix Four, Inc.</u> v. <u>Strategic Res. Corp.</u>, 2006 WL 1409413 at *4;  <u>Anderson</u> v. <u>Sotheby's Inc. Severance Plan</u>, 2005 WL 2583715 at *3; <u>Zubulake</u> v. <u>UBS Warburg LLC</u>, 229 F.R.D. at 431.

plaintiffs have submitted e-mails produced by individual defendant George Blumenthal, in which the company's financial strategies are discussed by its directors, officers and managers, that tend to support plaintiffs' allegations in this case.  (See 02 Civ. 7377, Dkt. No. 29: 4/11/06 Hermann Aff. Ex. E: Blumenthal E-mails.)  Moreover, defendant Blumenthal produced numerous additional e-mails from the crucial year of 2001 that defendant NTL Europe failed to produce.  (See page 7 above.)  Thus, if NTL Europe were able to produce the forty-four key players' missing e-mails, those e-mails likely would reveal similar information that would be helpful for the prosecution of plaintiffs' case.  See Phoenix Four, Inc. v. Strategic Res. Corp., 05 Civ. 4837, 2006 WL 1409413 at *6 (S.D.N.Y. May 23, 2006) (plaintiff demonstrated that documents deleted from server would be relevant to plaintiff's case by showing that similar evidence received from the server was supportive of plaintiff's central claims); Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *9 (some evidence of records tending to prove plaintiffs' allegations enough to show relevance of other similar records that were destroyed, leading the court to impose an adverse inference sanction against defendants); Golia v. Leslie Fay Co., 01 Civ. 1111, 2003 WL 21878788 at *10-11 (S.D.N.Y. Aug. 7, 2003) (plaintiffs demonstrated that the type of documents that were destroyed would have provided evidence pertinent to two central issues of the case, and court found that a "jury could conclude that all of this evidence would have been favorable to plaintiffs," leading the court to impose an adverse inference sanction against defendants).

Therefore, the Gordon plaintiffs have shown that the destroyed evidence was "relevant" to their allegations.

* * * * *

Because the Gordon plaintiffs have shown that NTL Europe had the duty to preserve documents and ESI relevant to this litigation as early as March 2002, that NTL Europe was at a minimum grossly negligent in allowing documents and ESI including the e-mails of approximately forty-four key players to be destroyed, and that those e-mails were relevant to the Gordon plaintiffs' claims, the Gordon plaintiffs have demonstrated that an adverse inference instruction spoliation sanction against defendant NTL Europe is warranted in this case.[32]

## III.  THE GORDON PLAINTIFFS' MOTION FOR MONETARY SANCTIONS IS GRANTED

The Gordon plaintiffs are also entitled to an award of the costs, including attorneys' fees, that they incurred in connection with this motion.  "Such a monetary award 'may be appropriate to punish the offending party for its actions or to deter [the] litigant's conduct, sending the message that egregious conduct will not be tolerated.'"  Chan v. Triple 8 Palace, Inc., 03 Civ. 6048, 2005 WL 1925579 at *10 (S.D.N.Y. Aug. 11, 2005).  "Furthermore, such an award serves the remedial purpose of making the opposing party whole for costs incurred as a result of the spoliator's wrongful conduct."  Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *10.[33]  "'[C]ompensable costs may arise either from the discovery necessary to identify alternative sources of information or from the

---

[32]  Judge Kaplan will determine the precise wording of the adverse inference applicable at trial when crafting the jury charge.  This Court will consider the adverse inference when issuing its Report and Recommendation on defendant NTL Europe's pending summary judgment motion.

[33]  Accord, e.g., Pastorello v. City of New York, 95 Civ. 470, 2003 WL 1740606 at *13 (S.D.N.Y. Apr. 1, 2003), reconsideration denied, 2003 WL 22118972 (S.D.N.Y. Sept. 11, 2003); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78-79 (S.D.N.Y. 1991).

investigation and litigation of the document destruction itself.'"  Chan v. Triple 8 Palace, Inc., 2005 WL 1925579 at *10; accord, e.g., Phoenix Four, Inc. v. Strategic Res. Corp., 05 Civ. 4837, 2006 WL 1409413 at *9 (S.D.N.Y. May 23, 2006); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. at 78-79.[34]

There is no question that e-mails and documents that defendant NTL Europe should have produced to plaintiffs were destroyed.  Therefore, NTL Europe is ordered to reimburse the Gordon plaintiffs for costs and attorneys' fees (but not class counsel's attorneys' fees) associated with bringing this motion.  See also, e.g., Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 437 (S.D.N.Y. 2004) (ordering adverse inference instruction and imposing costs of the motion); Pastorello v. City of New York, 2003 WL 1740606 at *13 (awarding costs and attorneys' fees as well as an adverse inference instruction); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. at 78 (awarding attorneys' fees because defendant's destruction of documents caused "plaintiff to expend time and effort in attempting to track down the relevant information.  It then caused the expenditure of additional resources by misleading the plaintiff and the Court . . .").  In addition, defendant NTL Europe's evasion of its discovery obligations required plaintiffs to pursue New NTL, and further required plaintiffs to take depositions, including the depositions of Jeffrey Brodsky, David Bond, and George Bernet, in order to understand the two NTLs' document and ESI retention and destruction policies. The Gordon plaintiffs are entitled to their attorneys' fees for all of this.

---

[34]     "When the misconduct is late production of evidence, compensable costs may also arise from the need to re-depose witnesses."  Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *9; accord, e.g., Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 222 (S.D.N.Y. 2003).

The Gordon plaintiffs shall provide defendant NTL Europe with its proposed fee request, and the parties shall try to agree on the appropriate reimbursement amount. Failing agreement, the Grodon plaintiffs are to submit a fee application to the Court promptly.

## **CONCLUSION**

For the reasons set forth above, the Court grants the Gordon plaintiffs' motion and awards an adverse inference spoliation sanction, plus attorneys' fees in an amount to be determined.

SO ORDERED.

DATED:      New York, New York
            January 30, 2007

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies to:    Robert Hermann, Esq.
              Jeffrey M. Haber, Esq.
              Arvind B. Khurana, Esq.
              Brooks R. Burdette, Esq.
              Seth M. Schwartz, Esq.
              Joel W. Sternman, Esq.
              Jennifer Rodburg, Esq.
              Judge Lewis A. Kaplan